# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS GORDON,<br><br>  Plaintiff,<br><br>vs.<br><br>PRUDENTIAL FINANCIAL, INC.; JOHN GREENE; and MATTHEW VOELKER,<br><br>  Defendants. | CASE NO. 06cv2304 IEG (WMc)<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT AND SCHEDULING ORDER; (Doc. No. 60) and**<br><br>**(2) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 47).** |

Presently before the Court are a motion for leave to amend the complaint and scheduling order brought by plaintiff Dennis Gordon and a motion for summary judgment brought by defendants Prudential Financial, Inc., John Greene, and Matthew Voelker. For the following reasons, the Court denies the motion to file an amended complaint and grants the motion for summary judgment.

## BACKGROUND

Factual Background

Plaintiff Dennis Gordon, a former employee of defendant Prudential Financial, Inc. ("Prudential"), brings this action against Prudential based on allegations surrounding his retirement after twenty-nine years of employment. Also named as defendants are Gordon's supervisor, Matthew Voelker, the Vice President of the Western Territory, and Voelker's supervisor, John Greene, President of Agency Distribution for Prudential.

1       The Court views the facts in the light most favorable to Gordon as the non-moving party, 2 although many are disputed by defendants. Plaintiff began working for Prudential in 1977 in 3 Easton, Pennsylvania. In 1996, he took the position of agency managing director (hereinafter 4 "managing director" or "MD") for the San Diego agency. The performance of his agency rapidly 5 improved under his leadership. Plaintiff, however, began to observe that other older managing 6 directors were being "forced out" and replaced by younger individuals. Plaintiff began to 7 experience poor treatment at the hands of Greene and Voelker and began to fear that he would also 8 be involuntarily terminated.

9       Specifically, Greene began to implement changes in Prudential's annual compensation 10 structure. Plaintiff strongly disagreed with these changes and believed they hurt the company's 11 ability to retain and recruit employees. When plaintiff attempted to privately discuss his concerns 12 about these changes with Greene, Greene encouraged him to discuss his concerns publically at a 13 meeting with other managing directors. Greene responded to plaintiff's concerns angrily and 14 demanded acceptance of policies which plaintiff viewed as destructive.

15       Several incidents which followed lead plaintiff to believe Greene did not like him. When 16 plaintiff's agency won an award in 2003, Greene took an excessive amount of time to review the 17 results and confirm plaintiff's award. When plaintiff followed the normal practice and planned a 18 dinner to honor his agency for this award, Greene did not support plaintiff's efforts. While 19 normally a celebratory dinner would be held at an expensive location, Greene criticized plaintiff's 20 choice of the Hotel Del Coronado. He made planning the dinner difficult, changing the date four 21 times and scheduling meetings at inconvenient hours. Although Greene apologized at the dinner 22 for not supporting plaintiff's choice of location, plaintiff remained hurt that Greene was so rude 23 and critical throughout the party-planning process and at the party.

24       In 2004, Prudential investigated an accusation by a former employee at plaintiff's agency. 25 Plaintiff believes the manner of investigation was "harsh, intrusive, accusatory, and I felt very 26 unprofessional and demeaning to my staff and myself." (Gordon Decl. at ¶ 15.) Human resources 27 conducted an investigation of another complaint, beginning in January of 2005, in an "aggressive, 28 demeaning, and accusatory" manner. (Id. at ¶ 20.) Plaintiff does not substantiate these

1  descriptions with any specific details.

2      Plaintiff believes these actions were motivated by plaintiff's age, which was fifty-four in 2005. Plaintiff explains "[b]y this time, I was aware that GREENE had made disparaging statements regarding older agency managing directors and that he, essentially, wanted to get rid of them and put younger people in control of the various agencies."  (Id. at ¶ 18.)

6      Age-related comments were made in plaintiff's presence on two occasions. At a 2005 meeting, plaintiff heard Greene express concern regarding "the aging and ages of the agent population." (Gordon Dep. at 565.) On another occasion, an unidentified younger employee made a comment in Greene's presence about a managing director's absence from a meeting. The younger employee joked that older managing directors have lots of vacation time and are always on cruises. (Gordon Dep. at 592.)

12     In the Spring of 2005, plaintiff spoke with Sharon Taylor, the head of human resources, about his concerns. He explained he disliked Greene and Voelker's management style and disagreed with their changes to the compensation structure. He told her that Greene had made disparaging remarks about older employees and that he would like Taylor to investigate, but not to discuss the issues with Greene or Voelker. Plaintiff also complained about the investigations into his agency and voiced his concern that Voelker and Greene were unethically failing to report an accurate number of inactive agents. Taylor contacted Suzy Domenick Burnham, a human resources assistant to Greene, and inquired about one of the investigations of plaintiff's agency. Taylor did not follow up with plaintiff, and he did not know whether or not she had investigated.

21     At a meeting on July 12 and 13, 2005, plaintiff expressed his concerns about the company. Plaintiff characterizes the events of the meeting as follows:

> My style has always been one of passion for the business of PRUDENTIAL and a commitment to make the company better. People who know me will all say that I am an open and honest person. In this meeting there was present Roy Friedman who had known me for years. He had been appointed Vice-President for the Life Division and asked for feedback, thoughts, ideas, and suggestions about how to increase the company's life insurance production. I expressed my thoughts in my style and hit the [sic] as a matter of emphasis to convey my thoughts and concerns.

27 (Gordon Decl. at ¶ 28.) The declaration appears to contain a typographical error and does not state what plaintiff hit during the meeting, but plaintiff's counsel confirmed at oral argument that the

1 object plaintiff hit was the table.  (<u>See also</u> Kern Dep. at 105.)

2 Plaintiff states no one at the meeting, including Voelker, reacted to this "innocuous" incident until Voelker brought it up during a phone call on July 19, 2005.  On July 25, Voelker sent plaintiff a "focus" or "fire-up" letter, which is the first stage of a disciplinary action at Prudential.  The letter explained that plaintiff would have to be more professional and should not use profanity at work.[1]  Plaintiff offered to publically apologize, but Voelker said that would be unnecessary.

On November 18, 2005, Voelker called plaintiff despite knowing he was taking a personal day and attending a seminar.  During a break in the seminar, plaintiff returned Voelker's "urgent" call and Voelker berated him for his bad attitude, inappropriate demeanor, and the July incident.  Voelker suggested that if plaintiff was thinking of retirement, Voelker would assist him in obtaining a severance package.  Voelker questioned plaintiff's commitment to the company, and confronted plaintiff about his plan to take a cruse and miss another meeting in December, his third missed meeting in a row.  Plaintiff reminded Voelker that the cruise was in honor of his 35th wedding anniversary, and plaintiff had cleared the date with Voelker's staff prior to booking it.[2]  Voelker brought these issues up again in a call on November 29, 2005.

On the day before plaintiff left town for the birth of his grandson and the Christmas holiday in December of 2005, Voelker told plaintiff to expect an important letter by fax.  The letter was an "action plan," the next step in Prudential's disciplinary process.  It stated plaintiff was not adequately progressing in responding to management's concerns about his attitude.  The "action

---

[1] In pertinent part, the letter read:
> Denny, another equally critical component of the MD position is being very solid in subjective/leadership skills – skills such as communication style, professionalism, business maturity and leading by example.  Lack of these skills can put the Company at risk.  The type of behavior you exhibited at the July Business Management Meeting is unacceptable which Prudential takes very seriously.  Denny, the expectation going forward is that this type of incident will not reoccur, and you will conduct yourself in a respectful and appropriate manner at all times.

(Plaintiff's Regular Notice of Lodgment, Exhibit 12.)

[2] Without plaintiff's knowledge, Cheryl Kern later investigated this booking in order to determine if plaintiff was lying.  A private investigator used plaintiff's wife's social security number to determine the approximate date of their marriage.  Kern learned the cruise was around the time of their anniversary.

plan" reiterated the same concerns about plaintiff's "communication style and frequency, professionalism, business maturity and leading by example" and stated plaintiff had not adequately addressed these issues. The "action plan" also stated plaintiff must attend all future national management meetings, have his vacation days approved, and focus on Prudential work during business hours. (Plaintiff's Regular Notice of Lodgment, Exhibit 10.) Plaintiff believed Voelker sent the letter at that time in order to ruin plaintiff's holiday season and time with his family.

Throughout this period, Voelker congratulated plaintiff on the performance of his agency in newsletters distributed to other managing directors.

On February 21, 2006, Voelker orally reviewed plaintiff's performance evaluation for 2005. Voelker deviated from normal practice by performing the review over the telephone, rather than in person, and by not giving plaintiff a written copy of the review. On the subjective component of the evaluation, Voelker gave plaintiff a "2," meaning an unsatisfactory job performance, although others had recommended he receive a "3." The 2005 rating was plaintiff's first below satisfactory rating in his twenty-nine-year career at Prudential. Because of this low numerical evaluation, his bonus for 2005 was only $14,000, a substantial reduction from his 2004 bonus of $26,230.

Finally, at a national conference in March of 2006, Greene "glared" at plaintiff and did not acknowledge his presence. When Greene's office attempted to schedule a conference call with plaintiff soon after this incident, plaintiff assumed he would be fired and instead decided to proactively retire on March 27, 2006. At that time, plaintiff was fifty-five years old. Prudential replaced plaintiff with a thirty-year-old individual.

Procedural Background

Plaintiff filed suit on September 5, 2006 in Superior Court for the County of San Diego. On October 16, 2006, defendants removed the case to this Court. (Doc. No. 1.) Plaintiff's claims are for: (1) age discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), (2) constructive wrongful termination in violation of FEHA, (3) constructive wrongful termination in violation of public policy, (4) breach of contract, and (5) breach of the covenant of good faith and fair dealing. While plaintiff originally alleged claims for intentional infliction of

1  emotional distress and negligent infliction of emotional distress, the Court granted the parties'
2  joint motion to dismiss these claims on June 2, 2008.  (Doc. No. 62.)

3  On May 19, 2008, defendant Prudential filed a motion for summary judgment.  (Doc. No.
4  47.)  The individual defendants filed a separate motion offering additional grounds for summary
5  judgment in their favor and joining in Prudential's motion.  (Doc. No. 48.)  On May 23, 2008,
6  plaintiff filed an ex parte motion to suspend hearing on the motion for summary judgment.  (Doc.
7  No. 50.)  On May 29, 2008, plaintiff filed a motion for leave to file an amended complaint.  (Doc.
8  No. 60.)  On June 2, 2008, the Court granted plaintiff's ex parte motion and continued the hearing
9  date on defendants' motions for summary judgment and plaintiff's motion for leave to amend.
10 (Doc. No. 61.)  On June 30, 2008, plaintiff filed an opposition to defendants' motion for summary
11 judgment.  (Doc. No. 67.)  Plaintiff also filed a notice of non-opposition as to part of the individual
12 defendants' motion for summary judgment.  (Doc. No. 66.)  Plaintiff lodged certain materials with
13 the Court and some exhibits were filed under seal.  (Doc. Nos. 69, 71-75.)  Defendants filed an
14 opposition to plaintiff's motion for leave to amend on June 30, 2008.  (Doc. No. 68.)  On July 7,
15 2008, plaintiff filed a reply in support of his motion for leave to amend.  (Doc. No. 77.)  Prudential
16 filed a reply in support of its motion for summary judgment.  (Doc. No. 79.)  Voelker and Greene
17 filed a separate reply (Doc. No. 80), and defendants also filed evidentiary objections (Doc. No.
18 81).

19 The Court heard oral argument on the motions on July 14, 2008, at 10:30 a.m.  Daniel
20 DiRe and William Pabarcus appeared on behalf of plaintiff and Stephen Katz appeared on behalf
21 of defendants.

DISCUSSION

<u>Legal Standards</u>

Summary judgment is proper where the pleadings and materials demonstrate "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A material issue of fact is a question the trier of fact must answer to determine the rights of the parties under the applicable substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute

1  is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving
2  party." Id. at 248.  Summary judgment may be granted in favor of a defendant on an ultimate issue
3  of fact where the defendant carries its burden of "pointing out to the district court that there is an
4  absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; see Nissan
5  Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000).

6        The moving party bears "the initial responsibility of informing the district court of the basis
7  for its motion." Celotex, 477 U.S. at 323.  To satisfy this burden, the moving party must
8  demonstrate that no genuine issue of material fact exists for trial. Id. at 322.  However, the
9  moving party is not required to negate those portions of the non-moving party's claim on which
10 the non-moving party bears the burden of proof. Id. at 323.  To withstand a motion for summary
11 judgment, the non-movant must then show that there are genuine factual issues which can only be
12 resolved by the trier of fact. Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir.
13 2000) (citing Fed. R. Civ. P. 56; Celotex, 477 U.S. at 323).  The nonmoving party may not rely on
14 the pleadings but must present specific facts creating a genuine issue of material fact. Nissan
15 Fire, 210 F.3d at 1103.  The inferences to be drawn from the facts must be viewed in a light most
16 favorable to the party opposing the motion, but conclusory allegations as to ultimate facts are not
17 adequate to defeat summary judgment. Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1180
18 (9th Cir. 2002).  The Court is not required "to scour the record in search of a genuine issue of
19 triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996), but rather "may limit its review
20 to the documents submitted for purposes of summary judgment and those parts of the record
21 specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030
22 (9th Cir. 2001).

23       Under Rule 15 of the Federal Rules of Civil Procedure, "a party may amend the party's
24 pleading only by leave of court or by written consent of the adverse party; and leave shall be freely
25 given when justice so requires." Leave to amend is granted with "extreme liberality." Morongo
26 Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990).  "There are several
27 accepted reasons why leave to amend should not be granted, including the presence of bad faith on
28 the part of the [party seeking to amend], undue delay, prejudice to the [party opposing

amendment], futility of amendment, and that the party has previously amended the relevant pleading." Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 989 F. Supp. 1237, 1241 (N.D. Cal. 1997).

I. Motion for Leave to Amend

Plaintiff has moved to amend his complaint to delete the allegations that defendants acted in order to prevent full vesting of plaintiff's retirement benefits. As pleaded, some of his discrimination claims are preempted by the Employee Retirement Income Security Act ("ERISA"). See ERISA § 510; 29 U.S.C. § 1140; Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139-40 (1990); Sorosky v. Burroughs Corp., 826 F.2d 794 (9th Cir. 1987). Because the cut-off date for filing a motion to amend was March 26, 2007 and plaintiff filed the motion on May 19, 2008, plaintiff also moves to amend the scheduling order. Plaintiff must show "good cause" under Rule 16 of the Federal Rules of Civil Procedure to modify the scheduling order.

Plaintiff has not shown good cause. Plaintiff has known that certain claims are preempted by ERISA since defendants filed the notice of removal on October 16, 2006. Because the discovery process yielded no support for his allegations that defendants acted in order to deprive him of retirement benefits, plaintiff now seeks to change his theory of the case almost two years into the case, and when the Court is ready to set a trial date. This is not good cause, and the Court will not permit the amendment. See Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992) (holding district court did not abuse its discretion in denying motion to amend on eve of trial when plaintiff realized claim was not properly brought against named defendant).

II. Motion for Summary Judgment

A. ERISA Preemption

Plaintiff concedes there is no evidence supporting his allegations that defendants acted in order to deprive him of full vesting of his retirement benefits. Accordingly, the Court grants defendants' motion for summary judgment as to plaintiff's claims for (1) age discrimination in order to deprive plaintiff of retirement benefits and (2) constructive wrongful termination in order to deprive plaintiff of retirement benefits.

B. Constructive Termination

Defendants also argue they are entitled to summary judgment as to plaintiff's remaining claims. Defendants focus on plaintiff's allegations that he was constructively terminated. Unless plaintiff's resignation was a constructive termination, plaintiff cannot prove his claims for (1) age discrimination in violation of FEHA, (2) constructive wrongful termination in violation of FEHA, (3) constructive wrongful termination in violation of public policy, (4) breach of contract, and (5) breach of the covenant of good faith and fair dealing. Defendants argue that, even viewing the facts in the light most favorable to plaintiff, he was not constructively discharged as a matter of law.

Legal Standard

The California Supreme Court articulated the legal standard for constructive discharge in Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238 (1994). "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign." Id. at 1244. The employer's actions must constitute a "continuous pattern," not "isolated acts." Id. at 1247. The burden is on the plaintiff "to show the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." Id. at 1251; see also Cellini v. Harcourt Brace & Co., 51 F. Supp. 2d 1028 (S.D. Cal. 1999) (discussing Turner). The Court must evaluate the circumstances objectively, and the reaction of an "unreasonably sensitive" employee to the inherent "frustrations, challenges, and disappointments" of a job do not establish constructive discharge. Turner, 7 Cal. 4th at 1247. "[E]mployers have the right to unfairly and harshly criticize their employees, to embarrass them in front of other employees, and to threaten to terminate or demote the employee. Nevertheless, a continuous course of such actions, uncorrected by management, can constitute objectively intolerable working conditions." Thompson v. Tracor Flight Sys., Inc., 86 Cal. App. 4th 1156, 1171 (Cal. Ct. App. 2001) (internal citations omitted).

In Thomas v. Department of Corrections, 77 Cal. App. 4th 507 (Cal. Ct. App. 2000), the court explained:

> Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to

> the level of a materially adverse employment action. If every minor change in working conditions or trivial action were a materially adverse action then any action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. . . . . Most of the actions upon which [plaintiff] relies were one time events, such as a delayed check, an early job change, and failure to receive one overtime check. The other allegations, such as the general assertion that [plaintiff] was assigned more duties than other employees in the same unit, are not accompanied by facts which evidence both a substantial and detrimental effect on her employment.

Id. at 511-12 (internal citations and quotation marks omitted). In Palacio v. Progressive Insurance. Co., 244 F. Supp. 2d 1040 (C.D. Cal. 2002), the court found plaintiff had not been constructively discharged when her employer reduced her authority, unreasonably applied a timecard policy against her, unjustly and erroneously criticized her job performance, increased its supervision despite her experience, and caused her to believe she would soon be fired.

Analysis

Much of the evidence offered by plaintiff relates to whether defendants acted out of a discriminatory motive. The motion currently before the Court, however, relates to whether plaintiff raises a triable issue of fact with respect to constructive discharge, not discriminatory intent.

Viewing the facts in the light most favorable to plaintiff, he was unfairly treated by supervisors who did not like him, who did not appreciate his contributions to the company, and who plaintiff perceived intended to eliminate older employees. Specifically, over the course of four years,[3] Greene and Voelker became unfairly critical of plaintiff's work performance. They disciplined plaintiff for hitting the table in a meeting, which they characterized as unprofessional behavior. They questioned his commitment to the company after he missed three national management meetings in a row due to personal vacations. Greene criticized plaintiff's choice of location for a dinner in plaintiff's honor. The timing of the disciplinary letters and angry phone calls often caught plaintiff while on vacation or about to leave for the holidays. Voelker gave him

---

[3] While defendants repeatedly mention that certain incidents took place outside of the limitations period, the Court may consider these events. See Mullins v. Rockwell Intern. Corp., 15 Cal. 4th 731, 743 (1997) (considering events outside the limitations period); see also Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1058, n.17 (2005) (FEHA's statute of limitation should be construed to ensure claims are decided on the merits); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (holding court may consider acts outside the limitations period in a Title VII hostile work environment claim if at least one "component act" falls within the period).

1 a performance rating of "unsatisfactory" after nearly thirty years of positive reviews, and this
2 rating allegedly reduced plaintiff's bonus compensation.  Prudential investigated complaints
3 relating to plaintiff's agency in an "intrusive" and disrespectful manner.  Plaintiff heard second- or
4 third-hand that Greene and Voelker were making statements about eliminating older employees,
5 and plaintiff heard Greene express concern about the aging agent population.

6 These actions, viewed in their totality, do not rise to the level of constructive discharge
7 under California law.  As in Palacio, plaintiff alleges unjustified criticisms of his work
8 performance, increased supervision, and insecurity about his job.  244 F. Supp. 2d at 1040.  This
9 conduct is insufficient to show constructive discharge as a matter of law.  In the Thompson case,
10 criticism of job performance was severe enough to support a constructive discharge claim.  In that
11 case, the supervisor yelled, screamed, and cursed at the top of his lungs at plaintiff, was physically
12 violent with another employee, threatened the job of a family member, made it impossible for
13 plaintiff to do her job, used racial slurs and other offensive language, and stole her calendar.
14 Thompson, 86 Cal. App. 4th at 1171.  Even assuming defendants timed their communications with
15 plaintiff in order to ruin his Christmas holiday and cause maximum discomfort, the treatment did
16 not rise to an objectively intolerable level comparable to the treatment in Thompson.  On these
17 facts, a reasonable juror could not conclude Prudential "either intentionally created or knowingly
18 permitted working conditions that were so intolerable or aggravated at the time of the employee's
19 resignation that a reasonable employer would realize that a reasonable person in the employee's
20 position would be compelled to resign."  Turner, 7 Cal. 4th at 1251.

21 Accordingly, the Court enters summary judgment in favor of defendants on plaintiff's state
22 law claims for constructive discharge, breach of contract by constructive discharge, constructive
23 discharge in violation of public policy, and breach of the duty of good faith due to constructive
24 discharge.

25     C.      Harassment and Retaliation Claims

26 Finally, defendants argue the Court should grant summary judgment on plaintiff's claim of
27 harassment and retaliation in violation of FEHA.  Plaintiff bears the burden of establishing the
28 three elements of a harassment claim: "(1) he was subjected to verbal or physical conduct because

of his age, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment." Juell v. Forest Pharms., Inc., 456 F. Supp. 2d 1141, 1157 (E.D. Cal. 2006) (internal citation and quotation marks omitted). His prima facie case for retaliation "must show (1) [plaintiff] engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005).

Defendants argue the conduct was not sufficiently egregious to meet the "severe or pervasive" component of a harassment claim or the "adverse employment action" prong of a retaliation claim. Under Reno v. Baird, 18 Cal. 4th 640 (1998), regardless of any discriminatory motive, "commonly necessary personnel management actions such as . . . performance evaluations . . . do not come within the meaning of harassment." Id. at 646. In this case, plaintiff's claim relies primarily on criticisms of plaintiff's job performance, which are not harassment within the meaning of California law. See Roby v. McKesson Corp., 146 Cal. App. 4th 63, 75 (Cal. Ct. App. 2006) ("Acts such as selecting [plaintiff's] job assignments, ignoring her at staff meetings, portraying her job responsibilities in a negative light, or reprimanding her in connection with her performance, cannot be used to support a claim of hostile work environment."); Janken v. GM Hughes Elecs., 46 Cal. App. 4th 55, 63 (Cal. Ct. App. 1996) ("[H]arassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job.").

The factual support for plaintiff's harassment claim is weak when the Court disregards defendants' criticisms of plaintiff's job performance. Plaintiff heard about allegedly ageist statements second- or third-hand, and the statements were never directed at him. Greene and Voelker glared at plaintiff and treated him disrespectfully, but they also congratulated him when his agency performed well. Greene even apologized for criticizing the location of plaintiff's party. Accordingly, defendants' conduct was not "severe or pervasive" enough to "alter the conditions of

plaintiff's employment." Juell, 456 F. Supp. 2d at 1157. His retaliation claim similarly fails because plaintiff has not shown Prudential took any "adverse employment action."

### III. The Individual Defendants' Motion for Summary Judgment

Individual defendants Voelker and Greene also argue they are entitled to summary judgment as to plaintiff's claims of discrimination and retaliation in violation of FEHA. Plaintiff concedes these claims may not be brought against individuals under Reno v. Baird, 18 Cal. 4th 640, 645-46 (1998), and Jones v. Lodge at Torrey Pines P'ship, 42 Cal. 4th 1158, 1174 (2008).[4] Accordingly, the individual defendants are also entitled to summary judgment on plaintiff's claims of discrimination and retaliation under FEHA.

### IV. Evidentiary Issues

Defendants' evidentiary objections are largely moot. Even if all of plaintiff's evidence was admissible, plaintiff has not shown constructive discharge as a matter of law.

Plaintiff attempts to introduce reports by James Murphy, a private investigator, setting forth what certain former employees of Prudential told him. The attachments to the Murphy declaration violate the rule against hearsay evidence and are inadmissible. See Fed. R. Evid. 801(c); Orr v. Bank of Am., NT & SA, 285 F.3d 764, 778-80 (9th Cir. 2002) (applying rule against hearsay evidence on summary judgment motion); Fed. R. Civ. P. 56(e) (requiring facts in affidavits "would be admissible in evidence").[5] While plaintiff argues this evidence is admissible under Rule 804, plaintiff has not shown the statements were "so far contrary to the declarant's pecuniary or proprietary interest . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3).

Plaintiff has also offered declarations by former employees which contain hearsay

---

[4] While plaintiff's notice of non-opposition argued retaliation claims may be brought against individuals, at oral argument plaintiff's counsel conceded Jones applies.

[5] See also Wilborn v. Ashcroft, 222 F. Supp. 2d 1192, 1201 (S.D. Cal. 2002) ("Plaintiff also cites four comments allegedly made by Gordon Markham which purportedly demonstrate that Markham harbored a general animus toward various minority groups and women . . . The problem with this argument is that plaintiff can point to no admissible evidence that Markham ever made the remark. The statement upon which plaintiff relies is hearsay. Moreover, it does not fall under any of the hearsay exceptions set forth in the Federal Rules of Evidence. As hearsay, the statement is not admissible for purposes of a Rule 56 motion.").

statements. Ernie Antonini states he "*was told that* GREENE made the following statements directly concerning the older agency managing directors . . . ." (Antonini Decl. at ¶ 6, emphasis added.) The statements are: "the old race horses need to be put out to pasture"; "they can't stir the secret sauce and they can't keep up with the new systems and concepts"; and Greene planned to eliminate older managing directors, who would become "notches" on Greene's gun. (Id.) Dee Ann Fujioka also submitted a declaration stating Antonini told her Greene stated "[t]he old race horses need to be put out to pasture." (Fujioka Decl. at ¶4.)[6]

These statements do not fit within any of the exclusions from the definition of hearsay in Rule 801 of the Federal Rules of Evidence, or the hearsay exceptions in Rules 803, 804, and 807. Accordingly, the declarations are not admissible evidence that Greene or Voelker made the alleged statements.

The Court denies as moot defendants' remaining evidentiary objections.

## CONCLUSION

For the foregoing reasons, the Court hereby DENIES plaintiff's motion for leave to amend and GRANTS defendants' motion for summary judgment. This case is therefore deemed concluded. The Clerk of the Court shall close the case.

**DATED: July 24, 2008**

*Irma E. Gonzalez*
**IRMA E. GONZALEZ, Chief Judge
United States District Court**

---

[6] Ms. Fujioka also states she participated in a conference call in which Voelker asked: "How old do you think the average age of our workforce is?" and responded to his rhetorical question with the answer: "I'll tell you, it's in the 50's, and we have to get that number down." (Fujioka Decl. at ¶4.) As Ms. Fujioka heard the statement herself, this statement is not hearsay and is admissible to show Voelker made the statement.